[Cite as *State v. Rader*, 2013-Ohio-4822.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

     Plaintiff-Appellee                        :          C.A. CASE NO.     25660

v.                                               :          T.C. NO.     12CR1237

NATHAN C. RADER                                  :          (Criminal appeal from
                                                            Common Pleas Court)
     Defendant-Appellant                       :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   1st   day of    November   , 2013.

. . . . . . . . . .

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. No. 0076045, 120 W. Second Street, Suite 603, Dayton, Ohio 45402
       Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Nathan Rader appeals from a judgment of the Montgomery County Court of Common Pleas, which revoked community control sanctions previously imposed for a domestic violence conviction and sentenced him to two years in prison. For the following reasons, the judgment of the trial court will be affirmed.

{¶ 2}    In June 2012, Rader was indicted on one count of domestic violence, with two prior convictions for domestic violence. In July 2012, he pled guilty to the offense, a felony of the third degree. He was sentenced to community control sanctions for a period not to exceed five years and was informed that a violation of the community control sanctions could result in a prison sentence of three years. The conditions of community control included that Rader attend and complete the MonDay program.

{¶ 3}    On December 31, 2012, the State filed a notice of community control violation. The trial court held a hearing on the alleged violation on February 14, 2013, after which the court revoked Rader's community control. He was sentenced to two years of imprisonment.

{¶ 4}    Rader appeals, raising one assignment of error.

THE TRIAL COURT ERRED IN FINDING MR. RADER IN VIOLATION OF HIS COMMUNITY CONTROL SANCTIONS AND SENTENCING HIM TO PRISON.

{¶ 5}    Rader contends that his community control should not have been terminated because he wanted to complete the MonDay program, but was prevented from doing so "through no control" of his own and "against his wishes," because MonDay dismissed him from its program.

{¶ 6}    "The right to continue on community control depends upon compliance with community control conditions and is a matter resting within the sound discretion of the court. Accordingly, we review the trial court's decision to revoke a defendant's community control for an abuse of discretion. Abuse of discretion has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." (Internal citations omitted.) *State v. Lewis*,

2d Dist. Montgomery No. 23505, 2010-Ohio-3652, ¶ 11.

{¶ 7}     The following evidence was presented at the hearing regarding Rader's termination from the MonDay program.

{¶ 8}     Probation Officer Todd Patrick supervised Rader's community control and listed its conditions, which included the requirement that he attend and complete a six-month program at a community-based correctional facility, known as  MonDay.  Rader was on "no break" status, which meant that any violation of his community control "could place him back in front of the Court for a violation hearing."  Rader had been informed of these and other conditions, and Patrick had reviewed the conditions with Rader.

{¶ 9}      Charles Skolds, a Resident Leader at the MonDay program, supervised Rader and was present on December 21, 2012, when an incident occurred which led to Rader's termination from the program.  According to Skolds, at around 10 p.m. that night, "late night" began, a period during which residents who have earned certain privileges are allowed to come out of their rooms and "watch movies, play games, play cards, [and] drink soda pop" as a reward for doing well in the program.  Rader and approximately 25 other residents were participating that night.

{¶ 10}    A policy change was implemented that night, which changed the location of the late night activities from the resident floors to a multi-purpose room.  Residents were upset about this change, because phone calls could be made on the floors, but could not be made in the multi-purpose room.

{¶ 11}    Residents were required to stand in a line to be counted before being allowed to go to the multi-purpose room.  However, according to Skolds, they "broke the

line" and "dispersed when they were not authorized to disperse." Residents were repeatedly ordered by the two resident leaders and a team leader to get back in line, and the "vast majority" refused to do so. Several residents "instigat[ed] others to not obey orders," but Skolds could not say whether Rader was one of these individuals.

{¶ 12} When the "mutiny" ended, the residents calmed down, and order was restored, Skolds talked with approximately 12 residents, voluntarily, to allow them to civilly air their complaints. Rader was one of these residents, and he acknowledged during the discussion that he had broken the rules. At the end of this discussion, Skolds handed out "character coupons" to all the people who participated in the roundtable discussion, because although they "had committed their obvious rule violations by not following staff directives, * * * the evening ended on a positive note," and Skolds wanted to acknowledge those who had shown maturity and good communication skills.

{¶ 13} Skolds testified that Rader had committed more than ten rule violations at MonDay prior to the late night incident.

{¶ 14} Rader also testified at the hearing. He explained that, on December 21, the residents had been informed approximately two hours before "late night" that the location had been moved to the multi-purpose room. The residents were "upset" about this change "because people save their phone calls for late night to call their families or whoever," and no phone was available in the multi-purpose room. Because they were upset, residents were "stepping off the line." The floor leaders were issuing Level 3 rule violations (on a 4-level scale, with 4 being the highest). The residents filled out complaint forms, and then some of them discussed how they felt about the situation with Skolds, for which they received a

character coupon. Rader subsequently learned that his rule violation had been elevated to a Level 4, allegedly for inciting the disturbance.

{¶ 15} Rader admitted that he had not completed the MonDay program, but claimed that it was "under false pretenses." He also acknowledged that he was placed on "no breaks" status when his community control was imposed. He admitted to 17 rule violations while he was at the MonDay program.

{¶ 16} A video of the late night incident was played for the trial court at the hearing.

{¶ 17} In reaching its decision to revoke community control and send Rader to prison, the trial court repeatedly emphasized his "no break" status. The court pointed out that Rader was "not in a position to challenge anything" or "second guess or question any rule change or procedural change" at the MonDay program due to his "no-break" status. The trial court did not abuse its discretion in concluding that Rader's decision to protest a change in procedure at the MonDay program by purposely breaking a rule and then refusing to comply with staff orders, resulting in his discharge from the program, was grounds for termination of his community control.

{¶ 18} Rader contends that it was impossible for him to complete the MonDay program, although he was willing to do so. The State correctly observes that Rader did not raise this argument in the trial court, and thus he may not raise it for the first time on appeal. See *State v. Weber*, 2d Dist. Montgomery No. 25508, 2013-Ohio-3172, ¶ 33; *State v. Myles*, 2d Dist. Montgomery No. 25160, 2013-Ohio-1821, ¶ 15.

{¶ 19} Moreover, the defense of impossibility generally arises in contempt

proceedings, where it implies that the completion of a task is beyond or outside of one's control. *See Frey v. Frey*, 197 Ohio App.3d 273, 2011-Ohio-6012, 967 N.E.2d 246, ¶ 26 (3rd Dist.); *Ruben v. Ruben*, 10th Dist. Franklin No. 12AP-717, 2013-Ohio-3924, ¶ 32. "Impossibility of performance is not a valid defense where [a party] created the impossibility by his own actions." *Ruben* at ¶ 32. Rader's situation was of his own creation. He was discharged from the MonDay program for a Level 4 rule violation, which followed 17 other rule violations of lesser degree. Because his own acts resulted in his inability to complete the MonDay program, Rader's completion of the program was not "impossible."

**{¶ 20}** The assignment of error is overruled.

**{¶ 21}** The judgment of the trial court will be affirmed.

. . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

April F. Campbell
Elizabeth C. Scott
Hon. Michael W. Krumholtz